**Patricia BEAVER, Plaintiff,**

v.

**DELTA AIR LINES, INC. Defendant.**

**No. CIV.A.3:97–CV–2673–P.**

United States District Court,
N.D. Texas,
Dallas Division.

March 23, 1999.

Patrick J. Funiciello, Joan M. Durkin, Euless, TX, for Plaintiff.

Andrea L. Bowman, Stephen F. Fink, Bryan P. Neal, Dallas, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Presently before the Court is Defendant's Motion for Summary Judgment, filed on January 6, 1999. Plaintiff filed a Response on January 27, 1999 and Defendant filed a Reply on February 8, 1999. For the reasons set forth below, the Court is of the opinion that Defendant's motion should be GRANTED.

## BACKGROUND

This is an employment discrimination case. Plaintiff Patricia Beaver ("Plaintiff" or "Beaver") alleges that Defendant Delta Air Lines ("Defendant" or "Delta") discriminated against her because of a partial blind spot in her vision. Specifically, Beaver contends that Delta violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by refusing to accommodate her known disability.

Beaver became employed by Delta in Dallas, Texas as a Reservations Sales Agent[1] ("RSA") in October 1987 and remained in that capacity until mid 1995 when she was transferred to the position of a senior clerk. Pl.'s Resp. at 1. Beaver contends that this transfer was an unreasonable accommodation and thus a violation of her rights under the ADA.

According to Delta, from the time Beaver became a Delta employee, she was repeatedly counseled about her poor productivity, lack of sales effort, and poor attendance.[2] Def.'s Mot. at 4. On May 17, 1992, Beaver suffered a severe closed head injury. As a result of this injury, and the complications arising from it, Beaver was hospitalized for nearly two full months. In total, Beaver took eight months leave from work. During this interim, Delta paid Beaver a combination of sick leave and disability leave benefits. Beaver suffered permanent, partial vision loss in both eyes. Pl.'s Resp. at 1.

Upon returning to work in January 1993, Delta offered Beaver the option of working on a part-time basis, but Beaver declined the offer. Def.'s Mot. at 5. Instead, Beaver returned to work on a full time basis as an RSA. At that time, Beaver's doctor restricted her from working more than eight hours a day. Def.'s Mot. at 5; Def.'s App. 13, 45,148.

According to Delta, shortly after Beaver's return, her past performance deficiencies resurfaced. Beaver was continuously counseled for her poor productivity. Between December 1993 and August 1994, she was counseled at least twelve (12) times regarding her poor productivity, lack of salesmanship and poor attendance. Def.'s Mot. at 6. During these sessions, Beaver was advised that Delta could not accept less productivity from her than was expected of other RSAs.[3] In response, Beaver indicated that her blind spots caused her to read more slowly, thereby affecting her productivity at Delta.[4] Pl.'s Resp. at 1.

In May 1994, Delta issued a letter to Beaver that indicated her deficiencies and that she must improve in order to avoid more serious disciplinary action. Def.'s Mot. at 6; Beaver Dep. Ex. 12 (App.152) Because Beaver's performance did not improve, by August 1994, Delta placed her on a six month probationary period. In response, Beaver requested that she be excused from Delta's productivity requirements. She indicated that needed more

---

1. RSAs are hired for the sole purpose of promptly and effectively assisting telephone customers with their travel needs. Def.'s Mot. at 1. RSAs are directly responsible for generating revenue for Delta by selling the company's services to customers. *Id.* at 3. Beaver's basic job responsibilities included taking calls from customers, locating flight information in the computer, reading information from the computer screen and hard copy materials, conveying that information to callers and entering reservation information. Pl.'s Compl. at 4.

2. From 1988 through 1991, Beaver's evaluations reflected Delta's concern with these deficiencies. Def.'s Mot. at 5.

3. Delta's productivity requirements are posted in the RSA work area. Delta claims that research has shown that customers will stay on hold only for a short time. McKechnie Decl. ¶ 3. If the call remains unanswered for a long time, the customer will often hang up and contact another airline, possibly causing Delta to loose the customer. *Id.*

4. Beaver alleges that she can not read as quickly as she did prior to the injuries. Pl.'s Resp. at 1.

time to perform her job and more breaks to alleviate her stress and headaches. Def.'s Mot. at 6. Delta informed Beaver that she needed to submit medical documentation to that effect, which outlined her specific needs, but until she submitted such documentation she had to comply with Delta's expectations. *Id.*

Between August and October 1994, Beaver's work did not improve. Her supervisors continued to counsel her and she received below average on her September 1994 evaluation for productivity and attendance. Delta reminded Beaver that her failure to improve would result in her being placed on final warning.[5] On October 14, 1994, because Beaver's productivity and attendance did not improve, Delta issued a final warning letter. The letter described Beaver's alleged deficiencies since being placed on probation in August 1994. Specifically, the letter detailed Beaver's unauthorized breaks, extended lunch breaks, unavailability for calls due to conversations with co-workers, and poor productivity. Beaver Dep. Ex. 16 (App.156); Def.'s Mot. at 7. The letter also informed Beaver that the failure to improve would result in the recommendation to terminate her employment. *Id.*

Despite the counseling Beaver received regarding her poor productivity and attendance, Beaver's performance did not improve over the next few months. Beaver repeatedly explained her deficiencies by alleging that she needed to rest between calls. Although Beaver had submitted documentation from her treating physician, Delta did not find that such documentation specifically set forth what job modifications would be required.

In January 1995, Delta took away some of Beaver's job responsibilities, such as answering information calls from Spanish speaking customers, to allow her to concentrate on general sales calls. However, during April 1995, Delta concluded that Beaver's performance was still not up to par with its standards, so Delta decided to suspend her pending review of her work record.[6]

In response to this action, Beaver suggested that she might be able to meet Delta's expectations if she were given a part-time, four hour a day position. Beaver Dep.App. 107–108; Def.'s Mot. at 8. However, Beaver turned down the position once Delta offered it to her. Nonetheless, Delta decided to permit Beaver to return to work as a full-time employee, with the understanding that Beaver needed to meet Delta's expectations. In addition, Beaver was warned that the failure to improve would result in the termination of her employment.

In the following months, Beaver's productivity did not improve. On June 14, 1995, Beaver's supervisors decided to remove her from the RSA position and place her on suspension. Def.'s Mot. at 9. In lieu of discharge, Delta gave Beaver the option of pursuing the company's job-placement process.[7] On June 20, 1995, however, Beaver filed an Accommodation Request Form in which she asked to be reinstated to the RSA position and that Delta accommodate her needs. Beaver Dep. Ex. 27 (App.164). Specifically, Bea-

---

**5.** Once a final warning letter is issued, this is an employees last chance to improve before being recommended for discharge. In addition, once the letter is issued it remains in the employees file for the duration of their employment with Delta. McKechnie Decl. ¶ 6.

**6.** According to Delta, during an observation on April 10, 1995, Beaver's supervisor indicated that Beaver took four calls in one hour and was available for calls only 80% of the time she was signed into her terminal. In

addition, Beaver took a twenty-five minute unauthorized break. Def.'s Mot. at 8.

**7.** According to Delta, if an employee is unable to perform the essential functions of his or her position because of a medical restriction, Delta seeks to place the employee in an alternate position that is consistent with their medical restrictions and job qualifications. Delta alleges that it offers this process even if the employee is not "disabled" under applicable law. McKechnie Decl. ¶ 9.

ver asked for additional time to take calls. In addition, Beaver proposed that Delta assign her to "rates, customer service, or the medallion desk." [8] *Id.*

In July 1995, Delta's Medical Director reviewed the medical documentation Beaver had submitted. He determined that Beaver did suffer from a medical condition that restricted her ability to perform duties requiring rapid, continuous reading. Def.'s Mot. at 10; Def.'s App. 53. He also concluded that her medical restrictions precluded her from performing the essential functions of the RSA position. According to Defendant, Beaver again requested that Delta accommodate her by excusing her from the RSA requirements regarding productivity. Delta refused to grant Beaver this accommodation and instead, started looking for a job within the company that would meet Beaver's medical restrictions. While the job search endured, Delta reinstated Beaver to the payroll and allowed her to use her paid sick days. In September 1995, a position as a senior clerk at the Dallas/Fort Worth ("DFW") Airport was identified. Beaver accepted the position and began working in November 1995.

In May 1996, Beaver filed a charge of discrimination with the Equal Employment opportunity Commission ("EEOC") alleging that Delta denied her a reasonable accommodation in June 1995 because she was not permitted to remain in the RSA position. Upon dismissal of these charges by the EEOC, Plaintiff filed the instant lawsuit on October 31, 1997.

## DISCUSSION

### I. *DEFENDANT'S OBJECTIONS TO THE DECLARATION OF EVELYN HARTMAN*

As a preliminary matter, the Court must consider Defendant's objections to portions of the Plaintiff's summary judgment evidence. Specifically, Defendant asks the Court to strike the declaration of Evelyn Hartman on the grounds that the declaration is unsworn, that Hartman is not an expert, and that the declaration is not based upon Hartman's personal knowledge. Because the Court has found it unnecessary to rely upon several portions of the challenged evidence, it need not consider Defendant's objections. Instead, insofar as it may be necessary, this Order will address specific objections to those portions of the disputed evidence that the Court regards as relevant to the resolution of the particular summary judgment issues.[9] The remaining portions of Defendant's motion is DENIED as MOOT.

### II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must identify the evidence on file in the case which establishes the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to establish the existence of essential elements of the party's case. *Matsushita Elec. In-*

---

8. Delta contends that those positions would have been promotions and are given to the best performing RSAs. McKechnie Decl. ¶ 8; Def.'s Mot. at 9.

9. The Court's rulings on specific objections will be addressed *infra.*

*dus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment; the party defending against a motion for summary judgment cannot defeat the motion unless it provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in its favor. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

All evidence and the inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Marshall v. Victoria Transp. Co.*, 603 F.2d 1122, 1123 (5th Cir.1979). However, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *PLAINTIFF'S ADA CLAIM*

Beaver's ADA claims comprise allegations that Delta discriminated against her by failing to accommodate her known limitations.

Title I of the ADA, which seeks to ensure equal employment opportunities for individuals with disabilities, comprises an expansive prohibition against disability-based employment discrimination:

> No covered entity shall discriminate against **a qualified individual with a disability** because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employment compensation, job training,

and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (emphasis added); *see also Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir.1996). Discrimination is defined broadly to encompass not only differential treatment of disabled employees but also an employer's failure to accommodate the employees' known limitations resulting from the disability. Thus, the ADA provides a definition of "discrimination" that includes

> not making **reasonable accommodations to the known physical or mental limitations** of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

*Id.* § 12112(b)(5)(A) (emphasis added). Reasonable accommodations, in turn, may include such measures as

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

The Fifth Circuit has indicated that a plaintiff bringing a claim of disability discrimination under the ADA may prove his/her case either by direct evidence or by employing the indirect method of proof established for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995). "Under the McDonnell Douglas analysis, a plaintiff must first make out a prima facie case of discrimination by showing that: (1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or

she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Id.* (citations omitted); *see also Turco,* 101 F.3d 1090, 1092 (5th Cir.1996); *Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758, 763 (5th Cir.1996). If the plaintiff does so successfully, he/she has raised a rebuttable presumption of discrimination and shifted the burden to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once the employer satisfies this burden of production, the plaintiff must then present evidence that the reason proffered by the defendant is actually a pretext for discrimination. *Id.* at 507, 113 S.Ct. 2742. A jury may in an appropriate case infer the requisite discriminatory intent circumstantially from a showing that the Defendant's stated reasons for taking the employment action were false and pretextual. *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996). The ultimate burden to prove discrimination at trial, of course, remains at all times with the plaintiff. *St. Mary's,* 509 U.S. at 508, 113 S.Ct. 2742; *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995).

### A. Plaintiff's Status as a Qualified Individual with a Disability

In order to avail herself of the protections of the ADA, Beaver must provide competent evidence that, at the time Delta made its allegedly discriminatory employment decisions, she was a qualified individual with a disability within the meaning of the statute. *See* 42 U.S.C. § 12112(a). Initially, Defendant maintains that Plaintiff has failed to meet her burden in this regard because she cannot demonstrate

that she had a disability as that term is defined under the ADA.

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996). Defendant asserts that Plaintiff's claim fails as a matter of law because the evidence fails to show that she possesses a physical impairment that substantially limits one or more of her major life activities.

The term "major life activities" refers to such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). A substantial limitation upon a major life activity exists if the limitation leaves the individual "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Rogers,* 87 F.3d at 758 (citing 29 C.F.R. § 1630.2(j)(1)). Among the factors a court should consider in determining whether an individual is substantially limited in a major life activity are: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

■ Plaintiff contends that her impairments place substantial limits on the major life activity of working.[10] Specifically,

---

10. Beaver does not claim that her impairment prevents her from caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, or learning. *See* Pl.'s Resp. at 2. Beaver admits that she can read books (although not quickly), drive a car and

Plaintiff asserts that her partial blind spot precludes her from performing jobs at Delta that require rapid, continuous reading, jobs requiring full vision fields, and jobs involving driving on a ramp. Pl.'s Resp. at 5; Pl.'s App. at 30. Defendant analyzes Plaintiff's condition and concludes that the blind spot in her vision does not substantially limit the major life activity of working. Def.'s Mot. at 12–14. Thus, Defendant asserts that Plaintiff cannot assert a claim under the ADA.

■ In order to establish a substantial limitation on working, a plaintiff must demonstrate a significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(i); *Hileman v. City of Dallas, Texas,* 115 F.3d 352, 354 (5th Cir.1997); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995). The inability to perform a narrow range of jobs only or a particular job alone does not constitute a substantial limitation in the major life activity of working. *Hileman,* 115 F.3d at 353. "The inability to work at the specific job of one's choosing is not a substantial limitation on a major life activity. 'The impairment must substantially limit employment generally.'" *Id.* (quoting *Byrne v. Board of Educ.,* 979 F.2d 560, 565 (7th Cir.1992)). Whether an impairment substantially limits a person's employment depends upon the "number and types of jobs from which he [or she] is disqualified, the geographic area to which he [or she] has reasonable access, and his [or her] employment qualifications." *Id.*

■ The evidence before the Court shows that Beaver is precluded from performing, at most, a narrow range of jobs.[11] The Court is of the opinion that although Beaver can not engage in rapid, continuous reading, Beaver is able to engage in work positions that require the ability to see and read. Beaver currently holds a position as a senior clerk[12] at Delta, which she has performed satisfactorily since November 1995. In addition, the summary judgment evidence shows that Beaver's impairment does not prevent her from engaging in other work-related activities. For example, Beaver owns and operates her own entertainment production company and assists her husband in his practice of law. Def.'s App. at 129–30, 137; Def.'s Mot. at 13. Eye problems or dysfunctions that do not limit normal daily activities do not constitute substantial limitations under the ADA. *See Still,* 120 F.3d at 51–52. Furthermore, the fact that Beaver is still employed by Delta is dispositive of her claimed substantial limitation on working.

■ In Plaintiff's response, Beaver also contends that she is protected under the ADA's "regarded as" definition of disability. Under the regulations promulgated by the EEOC, the "regarded as" language means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section

---

watch television. Beaver Dep.App. at 127–28.

**11.** The Fifth Circuit has found that restrictions precluding an employee from performing a type or narrow class of jobs are insufficient to constitute a substantial limitation on the ability to work. *See, e.g., Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999); *Sherrod v. American Airlines, Inc.,* 132

F.3d 1112, 1120 (5th Cir.1998); *Still v. Freeport–McMoran,* 120 F.3d 50, 51–52 (5th Cir.1997).

**12.** In this position, Beaver performs various secretarial duties such as using a computer, typing, answering phones, copying, faxing, and assisting supervisors with various projects. Def.'s Mot. at 14.

but is treated by a covered entity as having substantially limited impairment. *Sherrod,* 132 F.3d at 1121 (quoting 29 C.F.R. § 1630.2(*l*)); *accord Burch v. Coca–Cola Co.,* 119 F.3d 305, 322 (5th Cir.1997); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir.1996).

Beaver asserts that under this standard, even if the Court finds she does not have an impairment that is substantially limiting in the major life activity of working, Delta's perception that she did have the substantially limiting impairment makes her a qualified individual with a disability. Pl.'s Resp. at 5. Specifically, Beaver submits that, on July 15, 1995, Dr. Bisgard, Delta's Director of Health Services, concluded that after reviewing Beaver's doctor's submissions, he believed that she should be "restricted permanently from duties requiring rapid, continuous reading and full vision fields." Pl.'s App. at 30.

The fact that Delta had knowledge of Beaver's limited restrictions does not establish that Delta regarded Beaver as having a substantial limitation on her ability to work. *See Deas,* 152 F.3d at 481–82. In fact, in the present case, just the opposite is true. Delta provided Beaver with the option of working as a senior clerk, a position she accepted and remains working in to date. In such situations, the Fifth Circuit has found that an employee is not "regarded as" having a disability when an employer places the employee in another position. *See, e.g., Talk,* 165 F.3d at 1025; *Sherrod,* 132 F.3d at 1121. Such evidence could only permit a reasonable jury to conclude that Delta believed Beaver to be qualified for other positions. *Id.* Therefore, the Court is of the opinion that Delta did not regard Beaver as being disabled.

■ However, even if the Court found that Plaintiff had a disability for purposes of her ADA claim, Plaintiff's claim would still fail because this finding alone is not enough for Plaintiff to survive summary judgment. Under the ADA framework, Plaintiff must show that she is a qualified individual with a disability. As defined by the Code of Federal Regulations, a "qualified individual with a disability" is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. [It] does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). It is well established that an employee who cannot, even with accommodation, perform the essential functions of the job has no claim under the ADA because the employee is not a qualified individual with a disability. 29 C.F.R. § 1630.9(d); *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir.1996). The inquiry "is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower standards." 29 C.F.R. § 1630.2(n).

Defendant asserts that the employment actions taken in response to Plaintiff's lack of productivity, lack of sales effort, and poor attendance were non-discriminatory under the ADA because these are essential requirements of the RSA position. In response, Plaintiff contends that when an employer prepares a written description before advertising or interviewing applicants for a position, that job description shall be considered evidence of the essential functions of the job. Pl.'s Resp. at 6; 42 U.S.C. § 12111(8). Plaintiff then goes on to argue that in the present case, Delta's job description for the RSA position did not mention a 95% occupancy rate, or an average talk time of 318 seconds as being the essential functions of the position. Pl.'s Resp. at 6.

As Defendant points out, however, Delta's job description clearly states that an RSA "[h]andles a high volume of calls." Pl.'s App. at 32. Therefore, based on the summary judgment evidence on file in this case, the Court agrees with Defendant's position. The Court finds Delta's expected level of productivity to be consistent with the RSA job description. *See* Beaver Dep. App. at 133–34; Def.'s Reply at 7. Plaintiff's job as an RSA is particularly important to the efficient running of Delta's business. The purpose of an RSA is to assist Delta's customers quickly. In order to reach this goal, Delta has established productivity and performance standards for RSAs. Def.'s Mot. at 16 Satisfying and maintaining those standards is essential to increasing Delta's sale revenue. *Id.*

 Finally, Plaintiff admits that she could not have met Delta's productivity expectations without an accommodation. Beaver Dep.App. at 110, 119, 122–123. However, the accommodation Plaintiff requested, to be excused from meeting Delta's productivity requirements, would have required Delta to eliminate the essential functions of the RSA position. The ADA does not require such an accommodation.[13]

*See Robertson v. The Neuromedical Center*, 161 F.3d 292, 295 (5th Cir.1998); *Barber v. Nabors Drilling U.S.A.*, 130 F.3d 702, 709 (5th Cir.1997). Since Plaintiff was unable to perform an essential element of her job, with or without reasonable accommodation, she is not a qualified individual under the ADA and her claim must fail as a matter of law.[14]

## CONCLUSION

Having carefully reviewed the parties' arguments, the summary judgment evidence, and applicable law, the Court finds that Defendant's Motion for Summary Judgment is GRANTED.

So ordered.

13. In Plaintiff's complaint, Plaintiff suggests that such accommodation could include: having a reader communicate written messages and computer information, having a voice synthesizer read the computer data to her through a modified headset that could be used along with the telephone headset, software to spell and grammar check her entries, and typing or input assistance. Pl's Compl. at 4–5. Defendant denies that this request was made before Plaintiff was terminated from the RSA position and there is no evidence before the Court to suggest otherwise. *See Rodriguez v. Roadway Express Inc.*, No.CIV.A.L–96–11, 1997 WL 839014, at *5 (S.D.Tex. Dec.2, 1997) (finding that proposed accommodation is unreasonable because it is untimely). Furthermore, the Court finds that such an accommodation is not necessary. *See Robertson*, 161 F.3d at 295 (finding that the "law does not require an employer to transfer from the disabled employee any of the essential functions of [her] job. We cannot say that [the disabled] can perform the essential functions of the job with reasonable accommodation, if

the only successful accommodation is for [the disabled employee] not to perform those essential functions.")

14. Furthermore, the Court is of the opinion that even if Beaver were able to establish that she is a qualified individual with a disability for purposes of the ADA, her claim under the ADA fails because the Court concludes as a matter of law that Plaintiff's request for either a transfer to another position or to excuse Plaintiff from Delta's productivity requirements were not reasonable. The statute does not require employers to provide any accommodation that the employee requests. Indeed, the employer must do no more than afford the disabled employee an accommodation that is reasonable. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996). Furthermore, employers are not required to create jobs to accommodate an employee. *See, e.g., Still* 120 F.3d at 53. The Court finds that Delta reasonably accommodated Beaver's known disability by finding her a position as a senior clerk within Delta.